FILED IN MY OFFICE
DISTRICT COURT CLERK
12/19/2013 4:55:43 AM
STEPHEN T. PACHECO
rlr

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

# EXHIBIT B

**STATE OF NEW MEXICO *ex rel.***
**GARY K. KING, ATTORNEY GENERAL,**

**Plaintiff,**

**v.**
No. D-101-CV-2013-03197
_____

**VALLEY MEAT COMPANY, LLC,**
**DAIRYLAND PACKING, INC., MOUNTAIN**
**VIEW PACKING, LLC, and RICARDO DE**
**LOS SANTOS,**

**Defendants.**

_____

## COMPLAINT

**COMES NOW** the State of New Mexico, *ex rel.* Gary K. King, its Attorney General, and brings this Complaint and in support thereof states:

### I.    PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Gary K. King is the duly elected Attorney General of the State of New Mexico (the "State"). The Attorney General has the statutory authority to enforce laws for the protection of the public in New Mexico, and may initiate proceedings on behalf of the State where in his judgment the public interest requires legal action. NMSA 1978, § 8-5-2(B) and (J).

2.    Defendant Valley Meat Company, LLC ("Valley Meat") is a New Mexico limited liability company with a principal place of business at 3845 Cedarvale Road, Roswell, New Mexico 88203.

3.      According to records Valley Meat has filed with the New Mexico Secretary of State and with the New Mexico Environment Department ("NMED"), Ricardo De Los Santos is the company's officer and agent.  De Los Santos also holds himself out as the owner of Valley Meat.

4.      Defendant Dairyland Packing, Inc. ("Dairyland") is a New Mexico corporation with a principal place of business at 5107 Thunderbird Lane, Roswell, New Mexico 88203.

5.      According to records Dairyland has filed with the New Mexico Secretary of State, Ricardo De Los Santos is the company's sole officer, director, and agent.

6.      Defendant Mountain View Packing, LLC ("Mountain View") is a New Mexico limited liability corporation with a principal place of business at 3845 Cedarvale Road, Roswell, New Mexico 88203.

7.      According to records Mountain View has filed with the New Mexico Secretary of State and with NMED, Ricardo De Los Santos is the company's officer and agent.

8.      Defendant Ricardo De Los Santos is, upon information and belief, a resident of Chaves County, New Mexico.  De Los Santos is the owner, officer, director, and/or agent of Valley Meat, Dairyland, and Mountain View.   Under his own proprietorship and/or through Defendant companies, De Los Santos has operated a cattle slaughterhouse located at 3845 Cedarvale Road, Roswell, New Mexico 88203 (the "Slaughterhouse") in the past and now plans to use the same facility to slaughter horses for human food.

9.      As a court of general jurisdiction, this Court has jurisdiction over this matter and the parties.

10.     Venue is proper in this County pursuant to NMSA 1978, § 38-3-1(A) because the Attorney General resides in this County.

## II.     FACTS COMMON TO ALL COUNTS

### Defendants' Slaughter Operations Generally

11.     A predecessor corporation of Valley Meat first began processing cattle at the Slaughterhouse in or around 1982.

12.     De Los Santos took over the cattle slaughter business based at the Slaughterhouse in or around 1989.  Upon information and belief, De Los Santos has operated the Slaughterhouse at times through the Defendant companies, and at other times under his individual proprietorship, using business names including Pecos Valley Meat Packing Company, Pecos Valley Meat, and Valley Meat.  The precise business relationship among the various Defendant companies is at present unknown.

13.     De Los Santos continued to process cattle, through Defendant companies and/or under his individual proprietorship, until ceasing those operations in or around April 2012.

14.     Defendants plan to resume business operations in the imminent future at the Slaughterhouse.  Instead of slaughtering cattle, however, Defendants now intend to switch to a new enterprise – the slaughter of horses for human consumption.

### Defendants' Chronic Failure to Comply With New Mexico Environmental and Safety Laws

15.     Defendants have a long and well-documented history of violating New Mexico and federal environmental and safety laws at the Slaughterhouse.

3

16.     As a condition of receiving permission from NMED to discharge wastewater, Defendants were required to monitor and test groundwater samples in the vicinity of the Slaughterhouse and submit reports of that monitoring to NMED. These monitoring and reporting requirements allow NMED to evaluate whether a particular facility is taking the required steps to prevent water pollution from its operations, as required by state environmental regulations.   Defendants' environmental permit compliance history shows that they have repeatedly violated the basic monitoring requirements of almost every discharge permit and renewal they have been issued since the first permit was approved in 1982.

17.     Between 1986 and 2005, Defendants repeatedly failed to meet these basic monitoring and reporting requirements, on some occasions for years at a time.  Over a ten-year period from 1994 to 2003, Defendants failed to submit the required monitoring results more than half of the time.  As a result of Defendants' violations, NMED issued Defendants two Notices of Non-Compliance for failure to comply with regulations promulgated pursuant to the New Mexico Water Quality Act ("Water Quality Act"), NMSA 1978, §§ 74-6-1 *et seq*.  Defendants' repeated violations, after receiving notice, demonstrate their willful disregard of environmental laws.

18.     Defendants have continued this pattern of willful disregard of environmental laws by failing to submit monitoring reports more recently.  During the last ten years, Defendants have not submitted quarterly monitoring reports 60% of the time.

19.     In 2009, Defendants simply ignored altogether their obligation to have a valid discharge permit, let their permit at the time expire, and then operated the

4

Slaughterhouse without any permit at all for approximately three years, with each day constituting a new violation of New Mexico environmental laws. A discharge permit issued by NMED represents the fundamental mechanism under the Water Quality Act to ensure that groundwater does not become contaminated. During this approximately three-year period, Defendants unlawfully discharged thousands of gallons of slaughterhouse wastewater every day.

20. On May 7, 2010, NMED issued a Notice of Violation to Valley Meat Company for failing to renew its permit and for discharging without a permit since May 19, 2009. Nevertheless, Defendants continued to operate without a valid wastewater discharge permit for approximately two more years. This repeated history of non-compliance again evidences Defendants' flagrant disregard for environmental laws.

21. Defendants' environmental compliance failures are not limited to problems with wastewater monitoring, reporting and unauthorized discharge. Since at least 2010 and until 2012, Defendants were in constant violation of the New Mexico Solid Waste Act, disposing of the bodies of dead animals illegally and in a manner that harmed the environment or endangered public health or safety, and storing or disposing of those bodies and body parts in violation of New Mexico law. Over this period, Defendants dumped the remains of hundreds of dead and/or slaughtered animals on the grounds of the Slaughterhouse, in what became massive piles of rotting flesh and bones.

22. By letter dated January 22, 2010, Dr. Ron Nelson of the United States Department of Agriculture's Food Safety and Inspection Service ("FSIS") alerted the New Mexico Department of Health that "Mr. De Los Santos drags dead cattle (mostly old dairy cows) and piles them on a concrete pad where he leaves them to rot. He calls it

'composting' but by all appearances rotting would be more accurate.  I am told that during fly season the pile literally moves due to maggots.  At some point, he then moves the pile a little further back on his property where there are massive piles with hooves, legs, etc. sticking out.  These piles are high – perhaps 15 feet."

23.     A December 2010 inspection of Defendants' Slaughterhouse by NMED revealed that Defendants had not addressed the environmental and health problems identified by Dr. Nelson almost a year earlier.  In NMED's assessment, Defendants were still mishandling offal from their business, and found animal parts protruding from the large refuse pile on the grounds of the Slaughterhouse.  NMED found that Defendants' "excessively high piles" of offal "represent[] a potential public nuisance due to odors, increased potential for disease vector harborage," and improper waste disposal.  NMED documented "the presence of abandoned piles of old 'composted' material that had been permanently stored upon the ground for several years," and issued Valley Meat a Notice of Violation on January 4, 2011.

24.     For the next twenty months, Defendants continued to act in open violation of the New Mexico Solid Waste Act, and the piles of dead animals remained on the grounds of the Slaughterhouse, continuing the threat to the environment and public health.

25.     On August 2, 2012, NMED issued an Administrative Order Requiring Compliance and Assessing a Civil Penalty under the Solid Waste Act to Valley Meat for failing to register a composting operation; for failing to properly dispose of solid waste, specifically thousands of cubic yards of material consisting of bones, hides, and heads

mixed with manure; and for failing to properly compost offal, specifically uncovered animal parts and entire carcasses dumped in compost piles.

26.    Each day of noncompliance of the Solid Waste Act constituted a separate violation by Valley Meat.   In other words, Valley Meat committed *thousands* of violations of New Mexico environmental and public safety laws.

27.    In a Stipulated Final Order entered on November 16, 2012, Valley Meat acknowledged that it had stockpiled and abandoned some *500 to 600 tons* of decaying animal parts and waste material on its property.  NMED assessed a penalty of $86,400.00 for Valley Meat's misconduct, which would be mitigated upon Valley Meat's compliance with the Stipulated Final Order, including its agreement to remove the massive piles of waste.

28.    Defendants have also repeatedly violated federal food safety laws.  On January 23, 2009, FSIS notified Valley Meat that FSIS was suspending the assignment of inspectors – preventing the Slaughterhouse from processing cattle – because Valley Meat failed to meet food safety regulations as required by federal law.

29.    On July 23, 2010, FSIS again suspended inspections at the Slaughterhouse, this time for Valley Meat's failure to sample for E. Coli bacteria as required by federal law.

30.    On November 8, 2011, FSIS suspended inspections yet again, for a humane handling violation, specifically Valley Meat's failure to stun a cow in four attempts.

31.    On February 24, 2012, FSIS notified Valley Meat that inspections were suspended a *fourth* time, for another humane handling violation.

32.     Defendants' pattern of violations of a variety of environmental and health-related laws and regulations over a period of many years occurred in a heavily-regulated industry, cattle slaughter, with which Defendants had many years of experience.  Despite their past inability or unwillingness to comply with the law, Defendants are now poised to enter an entirely new field of operations with which they have no prior experience: horse slaughter.

### Risks of Commercial Horse Slaughter

33.     Horses have been an important part of New Mexico's culture, natural environment and economy for over 400 years, since Oñate brought them to the state in 1598.  Horses help produce goods and services worth $503 million to the State per year. The New Mexico horse industry generates about 45,000 jobs annually, and over 90,000 New Mexicans are involved in the horse industry as owners, employees, volunteers, and other service providers.  Horses are an essential part of a large recreational and show market. There are over 147,000 horses in New Mexico including over 80,000 who are involved in showing and recreation.

34.     The treatment of horses across the country is similar to that in New Mexico.  Nationwide, according to a 2007 study by the USDA, almost 46% of horses are used for recreation, 25% for farm and ranch work, 16% for breeding and 10% for show and competition.

35.     One purpose horses currently do not serve in New Mexico (or anywhere else in America) is as a source of meat for human consumption.  Because of the way New Mexicans treat their horses – as companions, as participants in competitive events, as

tools of labor – they neither raise horses for human consumption nor consume horse meat.

36.     Unlike traditional food animals such as cows, pigs and chickens, American horses have never systematically been bred or raised as food animals.  Horses that end up becoming meat come from varied backgrounds and have been exposed to a multitude of known and unknown drugs and other substances that have been applied to, injected in, and ingested by those horses.  Many of those substances have already been established as dangerous for humans, in any amount.  Virtually every one of them remains unstudied, and poses unknown risks, in connection with the manufacture and consumption of commercially produced horse meat.

37.     Historically, almost all horses that have been slaughtered for use as human food started their lives in one of three situations – as companion animals living with families across the United States and used for pleasure, recreation, and work; as sport horses (involved in, for instance, racing, rodeos, and other competitive activities); or as wild horses on public and private lands.

38.     In all three situations, horses have not been raised for food the way other animals, such as cows, pigs, and chickens are, that from before conception are maintained within a regulated industry.  Rather, horses, throughout their lives, are not in any way monitored or controlled to limit the presence of contaminants in their bodies.

39.     Most horses raised in America have ingested, or been treated or injected with, multiple chemical substances that are (1) known to be dangerous to humans if ingested, (2) untested with respect to their effect on the meat of horses who have received the substances, or (3) *specifically prohibited* by federal law for use in horses that are

destined to be slaughtered for meat. These substances to which horses have been exposed, including drugs that have been specifically banned for human consumption, create the potential for great risk to human health if they are ingested.

40. Some of these substances are *per se* dangerous to humans. Over the course of his or her life, each horse is exposed to hundreds of applications of drugs and other substances that could lead to harmful side effects in the humans who eventually eat meat from those horses.

41. The use of many of these drugs and other products cannot be avoided in caring for horses, and the use of these substances is often necessary to provide for the health, safety and comfort of the horses. The substances fall into a number of identifiable categories, each one including tens if not hundreds of individual generic or brand name products, which are regularly and routinely used on American horses:

a) First, in order to control common pests such as flies, ticks and other insects, horses are regularly treated with a number of substances, either topically or systemically. Many of these treatments are specifically labeled with a warning that the treatments should not be used on animals that will be slaughtered for food. One example of such a treatment is ponazuril (for treatment of equine protozoal myeloencephalitis).

b) Second, in order to treat various medical problems, horses are injected with medications, many of which are specifically banned from use in animals that will be used for meat. Examples include moxidectin (a dewormer) and ceftiofur crystalline free acid (for treatment of lower respiratory tract infections).

c)  Third, many horses are treated with antibiotic and antibacterial compounds that are specifically banned for use in food animals, and that could have a variety of negative health impacts if ingested in humans.  Examples of antibiotics given to horses include entamicin sulfate solution (for the control of bacterial infections in the uterus and for improving conception), olaquindox (for growth promotion), and furazolidone (for treating wounds and sores).

d)  Fourth, various hormones and steroids are used on competition and companion horses for various reasons.

e)  Fifth, many over-the-counter medications used on horses are expressly banned, in federal regulations enacted by the United States Food and Drug Administration ("FDA"), from use in food animals – something the FDA would not have done without a concern about humans eating meat tainted with those medications.

f)  Sixth, many drugs that are approved for use on horses are specifically prohibited from use on food animals, because of the need for all prescription drugs to be given under the direction and supervision of a physician.  It is a matter of common understanding that drugs of any kind, but especially prescription medications, should not be anonymously or secretly given to people.  But if those substances are administered to horses that are then slaughtered for food, unintended ingestion of those drugs is a very real consequence.

42.     By way of example, phenylbutazone, marketed as Butazone, Bute and Butequine, can cause severe toxic reactions and blood disorders in humans. Phenylbutazone is not approved for any human use in the United States.  The FDA states that "for animals, phenylbutazone is currently approved only for oral and injectable use in dogs and horses. Use in horses is limited to horses not intended for food. There are currently no approved uses of phenylbutazone in food-producing animals."  The FDA further determined that use of phenylbutazone in dairy cattle "will likely result in the presence, at slaughter, of residues that are toxic to humans, including being carcinogenic."

43.     There is a widespread consensus among regulatory agencies that phenylbutazone poses serious risks to human health.  For instance, the United States Department of Agriculture ("USDA") stated in 2007 that "phenylbutazone is considered to be one of the most toxic non-steroidal anti-inflammatory drugs.  It is not approved for use in food animals … the presence of any amount of phenylbutazone in food animal tissue will be considered a violation and likely to be unsafe for human consumption." Yet phenylbutazone is widely administered to American horses.  A recent scientific study concluded that every single one of the horses for whom medical records were obtained indicated "a positive history of [phenylbutazone] administration."  Nicholas Dodman, Nicolas Blondeau and Ann Marini, "Association of Phenylbutazone Usage With Horses Brought for Slaughter: A Public Health Risk." *48 Food and Chemical Toxicology* 1270 (2010).

44.     In addition to the widespread use on horses of phenylbutazone and numerous other drugs that are unapproved for use on food animals or for human

ingestion, virtually all horses in America lack adequate medical treatment records, if they have any records at all.   Because they do not consider their horses to be potential food, owners administer numerous drugs and other substances without regard to their effect on human beings who might later consume meat from those horses.

45.     Further, the medical and ownership history of horses that go to slaughter is typically unknown and unknowable, so that the subsequent owners, and commercial interests like auction yards and slaughterhouses will have no idea what substances were administered to horses being sold for slaughter by prior owners, even if prior owners kept treatment records (which is unlikely, as noted above).

**Defendants' Imminent Plans to Slaughter Horses for Human Consumption**

46.     Although Defendants were unwilling or unable to comply with their legal obligations even when they were slaughtering cattle, they have now announced plans to begin horse slaughter – a significantly different enterprise, which has not occurred anywhere in America for the past six years, and with which Defendants have absolutely no prior experience.

47.     Valley Meat filed suit against USDA in federal district court on October 19, 2012, to force the agency to issue a grant of inspection that would allow it to begin commercial horse slaughter for human food.

48.     Under sustained political pressure from proponents of horse slaughter, including some members of Congress, USDA issued a grant of inspection for Valley Meat on June 28, 2013, thereby permitting Defendants to begin slaughtering horses for human food.

49.     On July 2, 2013, before Defendants began slaughtering horses, a group of individuals and nonprofit organizations filed suit in federal district court against USDA. The suit sought declaratory and injunctive relief on the ground that  the agency failed to conduct an adequate environmental review as mandated by the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*., before issuing the grant of inspection to Valley Meat and another planned horse slaughter operation located in Iowa.

50.     The State intervened in that suit on July 19, 2013, to protect New Mexico's groundwater and other natural resources, and public health.   During the pendency of this suit, Defendants announced their readiness to immediately begin horse slaughter on various dates, including August 5, 2013.

51.     On November 1, 2013, the presiding federal district court judge dismissed the lawsuit against USDA, dissolved a previously entered temporary restraining order, and upheld USDA's determination that it could grant itself an exemption from the provisions of the National Environmental Policy Act with respect to the Slaughterhouse and its operations. The United States Court of Appeals for the Tenth Circuit entered a stay of the district court's order on November 4, 2013, but lifted that stay on December 13, 2013.

52.     Defendants have again publicly declared their readiness to begin commercial horse slaughter for human food within days.

53.     Defendants have publicly announced that they have already hired, or are in the process of hiring, employees for their horse slaughter operations.

54.     Absent relief from the Court, Defendants will imminently begin slaughtering horses of unknown origin and that have been subject to unknown living

conditions, with unknown and undisclosed medical histories. Those horses could include pets, racehorses, show horses, and wild horses. Defendants will imminently begin processing the carcasses of those horses into meat products for human consumers.

55.     Defendants will imminently discharge thousands of gallons of wastewater per day, without the required wastewater discharge permit and without a plan approved by NMED.

56.     Specifically, Defendants applied to NMED for a wastewater discharge permit, NMED held a public hearing to evaluate that application, and a decision remains under consideration. Nonetheless, Defendants have announced their belief that they are not actually required to obtain a permit because, in their view, they can store the wastewater in decades-old underground concrete tanks on the grounds of the Slaughterhouse, and then hire trucks to haul the wastewater to an unidentified site elsewhere for disposal.

57.     Defendants have stated that they intend to begin slaughter operations whether or not the discharge permit is granted even though the draft permit covers discharges to these underground concrete tanks, and Defendants cannot lawfully discharge to the tanks absent issuance of a valid permit by NMED.

**III.     COUNT ONE: VIOLATIONS OF THE NEW MEXICO FOOD ACT**

58.     The Attorney General repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

59.     The New Mexico Food Act ("Food Act"), NMSA 1978 §§ 25-2-1 *et seq.*, prohibits specified practices including "the manufacture, sale or delivery, holding or offering for sale of any food that is adulterated or misbranded," NMSA 1978 § 25-2-

3(A); "the adulteration or misbranding of any food," *id.* § 25-2-3(B); and "the receipt in commerce of any food that is adulterated or misbranded and the delivery or proffered delivery thereof for pay or otherwise," *id.* § 25-2-3(C).

60.     Under the Food Act, a food shall be deemed to be adulterated, *inter alia*, "if it bears or contains any poisonous or deleterious substance which may render it injurious to health," *id.* § 25-2-10(A)(1); "if it consists in whole or in part of a diseased, contaminated, filthy, impure or infested ingredient, putrid or decomposed substance, or if it is otherwise unfit for food," *id.* § 25-2-10(A)(3); or "if it has been produced, prepared, packed or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered diseased, unwholesome, or injurious to health," *id.* § 25-2-10(A)(4).

61.     Horse meat fits the Food Act's definition of an "adulterated" food product if the meat comes from horses that were treated with drugs that the FDA has deemed unsafe for use in food animals and/or unfit for human consumption.

62.     Horse meat fits the Food Act's definition of an "adulterated" food product if the horses slaughtered to make the meat were raised in insanitary conditions or in a manner that rendered the horses' meat unwholesome or injurious to health.

63.     Horse meat fits the Food Act's definition of an "adulterated" food product if it is otherwise unfit for human consumption.

64.     Horses in America are not raised for meat, and therefore (a) are routinely administered drugs and other substances that are not approved for use on food animals and/or unfit for human consumption, and (b) are raised with inadequate or no documentation of their medical histories and living conditions.

65.     Foodstuffs made from horses raised in America are produced under insanitary conditions as that term is defined by the Food Act.

66.     Defendants cannot ensure, and have evidenced no intention to ensure, that the horses they purchase and slaughter for human food are free from drugs or other substances deemed unsafe for use on food animals and/or unfit for human consumption in any amount.

67.     The horses that Defendants intend to purchase and slaughter for human food lack adequate, or any, medical histories and information about their living conditions, and therefore any meat made from those horses would be produced under insanitary conditions under the terms of the Food Act.

68.     Unless enjoined, Defendants will imminently slaughter horses, process them for human consumption, and place the products they manufacture into the human food supply through distribution and/or sale.

69.     Unless enjoined, Defendants will imminently manufacture, sell and/or distribute foodstuffs that may contain drugs and other substances that have not been approved for use on food animals and/or are not approved for human use in any amount, and therefore are unfit for human consumption.

70.     Unless enjoined, Defendants will imminently manufacture, sell and/or distribute foodstuffs made from horses for which there are no, or inadequate, medical histories and related information, and therefore those foodstuffs will be produced under insanitary conditions under the Food Act.

71.     Unless enjoined, Defendants will imminently manufacture, sell, and/or distribute horse meat in violation of the Food Act.

72.     The Attorney General seeks a temporary restraining order, and preliminary and permanent injunction, to prevent Defendants' violations of the Food Act and to avoid harm to the public.

## IV.     COUNT TWO: VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT

73.     The Attorney General repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

74.     The New Mexico Unfair Practices Act ("Unfair Practices Act"), NMSA 1978, §§ 57-12-1 *et seq.*, prohibits specified business practices in New Mexico, including statements or representations that may, tend to, or do deceive or mislead any person, which includes:

a)  statements or representations "causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services," *id.* § 57-12-2(D)(2);

b)  "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," *id.* § 57-12-2(D)(5);

c)  "representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another," *id.* § 57-12-2(D)(7); and

d)  "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive," *id.* § 57-12-2(D)(14).

75.     The Unfair Practices Act provides that such representations are unlawful. *Id.* § 57-12-3.

76.     By selling or distributing food products, Defendants are making an affirmative representation that the food in question is manufactured in compliance with state law.

77.     By selling or distributing food products, Defendants are making an affirmative representation that the food in question is not adulterated.

78.     By selling or distributing food products, Defendants making an affirmative representation that the food in question is not dangerous.

79.     By selling or distributing food products, Defendants are making an affirmative representation that the food in question is fit for human consumption.

80.     As set forth above, horses destined for commercial slaughter in the United States have been administered a wide range of drugs and other substances that are unsafe and/or unapproved for human consumption in any amount.  In addition, because horses are not raised as food animals in America, their medical histories and living conditions are inadequately documented, if not entirely unknown, when they are slaughtered and processed for meat, rendering their meat adulterated and unfit for human consumption.

81.     Defendants cannot ensure, and have evidenced no intention to ensure, that the horses they purchase and slaughter for human food are free from drugs or other substances deemed unsafe for use on food animals and/or unfit for human consumption in any amount.

82.     The horses that Defendants intend to purchase and slaughter for human food lack adequate, or any, medical histories and information about their living

conditions, and therefore any meat made from those horses would be produced under insanitary conditions, rendering that meat adulterated and unfit for human consumption.

83.     To date Defendants have not disclosed and have evidenced no intention to disclose to potential consumers the places of origin, living conditions, and medical histories of the horses that they intend to purchase and slaughter for human food.

84.     To date Defendants have not disclosed and have evidenced no intention to disclose to potential consumers that Defendants' horse meat products may contain drugs or other substances that are unsafe and/or unapproved for human consumption.

85.     Because sale of food for human consumption is a representation that the food in question is safe and fit for that purpose, and because horse meat is an adulterated product under the Food Act, Defendants cannot manufacture and sell horse meat without misrepresenting its safety or fitness.

86.     Unless enjoined, Defendants will imminently manufacture, distribute and sell horse meat products in a manner that will likely cause confusion and misunderstanding as to the origin, safety, and fitness for consumption of Defendants' products.

87.      Unless enjoined, Defendants will imminently manufacture, distribute and sell horse meat in violation of the Unfair Practices Act.

88.     The Unfair Practices Act provides that whenever the Attorney General has reasonable belief that any person is using, has used or is about to use any method, act or practice that is unlawful under the Unfair Practices Act, he may seek an injunction to prevent that unlawful act.

89.     The Attorney General seeks a temporary restraining order, and preliminary and permanent injunction, to prevent Defendants' violations of the Unfair Practices Act and to avoid harm to the public, along with a civil penalty of up to $5,000.00 per violation of the Unfair Practices Act pursuant to NMSA 1978, § 57-12-11.

## V.     COUNT THREE: VIOLATIONS OF THE WATER QUALITY ACT AND REGULATIONS

90.     The Attorney General repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

91.     The Water Quality Act  empowers the Water Quality Control Commission to establish regulations requiring persons to obtain a discharge permit for the discharge of any water contaminant, NMSA 1978, § 74-6-5(A), and to establish water quality standards, *id.* § 74-6-6.

92.     The Water Quality Control Commission has established regulations requiring persons to obtain a permit for the discharge of any contaminant that may move directly or indirectly into groundwater, and has established water quality standards. 20.6.2.3101 to -3114 NMAC.

93.     Unless enjoined, Defendants will imminently slaughter horses, process them for human consumption, and place the products they manufacture into the human food supply through distribution and/or sale.

94.     Defendants applied to NMED for a wastewater discharge permit, NMED held a public hearing to evaluate that application, and a decision remains under consideration.  Nonetheless Defendants have repeatedly and publicly stated their intention to begin operations at the Slaughterhouse regardless of whether and when the permit is issued.  Defendants have stated their belief that they can store the wastewater in

the decades-old, underground concrete tanks on the grounds of the Slaughterhouse, and then hire trucks to haul the wastewater to an unidentified site elsewhere for disposal, without a valid discharge permit.

95.    Defendants' stated "plan" for circumventing the NMED permit process is unlawful because, under the Water Quality Act and the regulations promulgated by the Water Quality Control Commission, they will still be "discharging" wastewater in the course of their planned horse slaughter operations to underground, permeable tanks that may allow water contaminants to move directly or indirectly into groundwater.  They intend to discharge imminently even though a discharge to the underground concrete tanks is within the scope of the draft discharge permit (and was covered under expired discharge permits previously issued to Defendants).   Defendants cannot lawfully discharge to the tanks absent issuance of the discharge permit by NMED.

96.    Unless enjoined, Defendants will imminently begin slaughtering horses and processing them into meat products for human consumption, thereby discharging thousands of gallons of wastewater a day without any permission to do so, in violation of the Water Quality Act and the regulations promulgated by the Water Quality Control Commission.

97.    Specifically, unless enjoined Defendants will be in violation of regulations including 20.6.2.1201.A NMAC (requirement that "any person intending to make a new water contaminant discharge or to alter the character or location of an existing water contaminant discharge" must file a notice with NMED); and 20.6.2.3104 NMAC ("Unless otherwise provided … no person shall cause or allow effluent or leachate to

discharge so that it may move directly or indirectly into ground water unless he is discharging pursuant to a discharge permit issued by the secretary [of NMED]").

98.     The Attorney General seeks a temporary restraining order, and preliminary and permanent injunction, to prevent Defendants' violations of the Water Quality Act and Water Quality Control Commission regulations and to avoid harm to the public, along with a civil penalty of up to $15,000.00 per day of non-compliance with the Water Quality Act, NMSA 1978, § 74-6-10.1(A).

## VI.     COUNT FOUR: COMMON-LAW PUBLIC NUISANCE

99.     The Attorney General repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

100.     Unless enjoined, Defendants will imminently begin slaughtering horses and processing their carcasses into meat for human consumption, despite knowing that those meat products may contain drugs and other substances unsafe for human use or unapproved for human consumption; despite lacking information on the origins, living conditions and medical histories of the horses it intends to slaughter; and despite failing to disclose to potential consumers any of the risks associated with consuming meat that may contain drugs or other substances unsafe for human consumption or unapproved for human use.

101.     Unless enjoined, Defendants will imminently begin slaughtering horses and processing their carcasses into meat for human consumption, thereby discharging thousands of gallons per day of wastewater that may contain drugs or other substances unsafe for human consumption or unapproved for human use, without permission from NMED to do so and therefore in violation of the Water Quality Act and Water Quality

Control Commission regulations.  This unlawful discharge of massive volumes of wastewater poses a direct threat to human health and to the integrity of groundwater resources in the vicinity of the Slaughterhouse.

102.    Defendants' actions, unless enjoined, will be injurious to public health and safety, to the natural environment, and to the public's use and enjoyment of public resources, namely groundwater and land, and therefore constitute a public nuisance.

103.    Defendants' prior track record of regularly violating environmental laws regarding water monitoring, recordkeeping, waste mishandling, and waste disposal demonstrate additional grounds for a determination by the Court that Defendants' operations constitute a public nuisance.

104.    The Attorney General seeks a temporary restraining order, and preliminary and permanent injunction, to prevent Defendants' commission of a nuisance that will be injurious to public health and safety, to the natural environment, and to the public's use and enjoyment of public resources, namely groundwater and land.

**WHEREFORE**, the Attorney General seeks a judgment and order against Defendants:

A.  For a temporary restraining order, preliminary injunction and permanent injunction barring Defendants from manufacturing, selling or distributing horse meat products for human consumption in violation of the Food Act;

B.  For a temporary restraining order, preliminary injunction and permanent injunction barring Defendants from manufacturing, selling or distributing horse meat products for human consumption in violation of the Unfair Practices Act;

C. For a civil penalty of up to $5,000.00 per violation of the Unfair Practices Act pursuant to NMSA 1978, § 57-12-11;

D. For a temporary restraining order, preliminary injunction and permanent injunction barring Defendants from manufacturing, selling or distributing horse meat products for human consumption because their operations at the Slaughterhouse will discharge water contaminants that may move directly or indirectly into groundwater and such discharge is unlawful where NMED has not issued a permit to Defendants for such discharge; ;

E. For a civil penalty of up to $15,000.00 per day of non-compliance with the Water Quality Act, NMSA 1978, § 74-6-10.1(A);

F. For costs expended in connection with this action; and

G. For such other relief as the Court deems just and proper.

Respectfully Submitted,

GARY K. KING
New Mexico Attorney General

By:

*/s/ Ari Biernoff*
Ari Biernoff
Assistant Attorney General
Post Office Drawer 1508
Santa Fe, NM 87504-1508
(505) 827-6086
abiernoff@nmag.gov

Of counsel: R. David Pederson